UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                         Case No. 2:07-cv-12986

       Plaintiff,                                 HONORABLE STEPHEN J. MURPHY, III

v.

CHRYSLER LLC,

       Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (D/E 28) AND DEFENDANT'S MOTION TO STRIKE (D/E 31)**

     This is an action brought by the Equal Employment Opportunity Commission ("EEOC") under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. The EEOC alleges that defendant Chrysler LLC ("Chrysler") subjected Rosalyn Grant to unlawful sex discrimination and retaliated against her supervisor, Christopher Oginski, when he complained about Grant being subject to such discrimination.

     Chrysler has moved for summary judgment against the EEOC on all claims at issue. Chrysler has also moved to strike certain evidence submitted by the EEOC in support of its opposition to Chrysler's summary judgment motion. For the reasons stated below, the Court denies both Chrysler's motion to strike and Chrysler's motion for summary judgment.

I    FACTS

     Charging parties Rosalyn Grant and Christopher Oginski were both employees of Chrysler's Mack Avenue Engine Plant, as was Thomas Steele, during the period of time most relevant to this motion. Oginski was Grant's direct supervisor in late 2005 and Steele was area manager at the Mack Avenue facility and was Oginski's direct supervisor and Grant's indirect supervisor.

Chrysler hired Rosalyn Grant in December 1993. (Motion for Summary Judgment, Exhibit 1, Grant dep. 15)  Grant started working at the Mack Avenue Engine Plant in 1998 or 1999. Grant dep. 20.  From that point forward, Grant worked as a jobsetter at the Mack Avenue facility, and eventually became responsible for Operation 70 ("Op. 70"), Operation 80 ("Op. 80") and Operation 90 ("Op. 90") on the expansion line at the Mack Avenue facility. Grant dep. 21-22.  The jobsetter is responsible for running the operation, changing tools, checking parts, offloading and loading on.  Grant dep. 22.  Operation 70 is part of the crank line and hardens the crank.  Grant dep. 22.  Operation 80 cuts the pump flat on the crank and also cuts the hub on the crank and the sensoring face.  Grant dep. 29.  Operation 90 drills oil holes and cranks. Grant dep. 31.

Grant's responsibilities on Operation 70 include checking parts.  Grant dep. 22.  Parts from Operation 70 are to be checked every 50 parts. *Id.*  This requires the jobsetter to request a part to come off the conveyer, put it on a cart, take it through a gauge station, clean it up, put it on the gauge, and manually rotate it as she checks the run-out.  Grant dep. 23.  The operation continues to run while the part is being checked. Grant dep. 25.  If the jobsetter determines that a part does not meet expected quality, she stops operations 70, 80, and 90 and informs either another employee or a supervisor that there is a bad part.  Grant dep. 25.  There is also some evidence that there is a recommended visual inspection at every 25th part, but that such a visual inspection was not mandatory or the subject of discipline. Grant dep. 27-28.

There is a 50-part check part requirement for Operation 80.  In order to perform the check part operation for Operation 80, the jobsetter must request a part to come off the conveyer, put it on a cart, clean the part, and check the part on two gauges.  Grant dep. 29-

30.  If the gauges show that the part is out of specification, the jobsetter would either shut down the operation or check another part.  Grant dep. 30.

<u>Grant's history of excessive scrap and discipline</u>

There is no evidence in the record that Grant received any discipline or suspensions prior to 2005, and plaintiff asserts that she did not.  Beginning in 2005, however, Grant began receiving numerous disciplines and suspensions for producing excessive scrap. Plaintiff also asserts that, while Thomas Steele and Grant worked at the same facility for a number of years, Steele only became an indirect supervisor of Grant in early 2005.

In May 2005, Grant was issued a written warning for a first offense of violating Standard of Conduct 9, production of excessive scrap or inferior work.  (Motion for Summary Judgment, Exhibit 4).  In this incident, Grant was written up by Kenneth Crawford, who stated that Kevin Thompson told Crawford that Grant had loaded  defective cranks into the system, requiring Thompson to purge the entire expansion line from Operations 80 to  200.  *Id.*  Grant received a written warning on May 4, 2005 for this incident.  (Motion for Summary Judgment, Exhibit 5).

Grant was involved in another incident of the production of excessive scrap in September 2005.  On September 13, 2005, Operation 70 produced 73 pieces of scrap crankshafts.  (Motion for Summary Judgment, Exhibit 6).  Thomas Steele and Kenneth Crawford each wrote a statement of facts regarding this incident.  (Motion for Summary Judgment, Exhibits 6 and 7).  Grant received a five day disciplinary lay off as a result of the incident.  (Motion for Summary Judgment, Exhibit 8).

Grant testified that sometimes Operation 70 would produce alternating good and bad parts and that management was aware of this.  She testified that, because of this, the check part process did not always detect a bad part even if there were bad parts being

3

produced.  Grant dep. 65-67.  Steele also testified that Operations 70 and 90 were capable of producing a good part and then a bad part. (Response, Exhibit 3, Steele dep. 109-110.

On Wednesday, October 26, 2005, a cutting error resulted in 83 scrap parts. (Motion for Summary Judgment, Exhibit 10).  Steele wrote a statement of facts regarding this incident, and the report for this incident was written by Christopher Oginski on Steele's instructions.  (Motion for Summary Judgment, Exhibits 10 and 11).  Oginski's report states that if the check part procedure had been properly followed, no more than 50 pieces of scrap would have been produced.  (Motion for Summary Judgment, Exhibit 11).  Steele forwarded Oginski's supervisor report along with his own statement of facts on the issue. (Motion for Summary Judgment Exhibit 12).  Grant received a 10-day disciplinary lay-off as a result of this incident.  (Motion for Summary Judgment, Exhibit 13).

On December 21, 2005, Steele wrote a statement of facts alleging that Grant's operation had produced 26 scrap cranks and that check part #25 with Grant's initials was also defective.  (Motion for Summary Judgment, Exhibit 14).  Grant was not disciplined for this incident because it did not produce in excess of 50 pieces of scrap.

On January 12, 2006, machines at both Operation 70 and Operation 80 on the expansion line malfunctioned.  A total of 85 pieces of scrap were produced in this incident. (Motion for Summary Judgment, Exhibit 15).  Grant was written up by Kevin Thompson and received a 30 day disciplinary lay off, from February 6 to March 8, 2006.

On February 8, 2006, Grant brought charges of harassment and discrimination against Thomas Steele.

On March 28, 2006, approximately 192 parts were found to be out of tolerance on the sensor ring face, including all four check-parts on the rack inspected by Grant.  The parts

4

were found to be usable and Grant was not disciplined.  (Motion for Summary Judgment, Exhibit 18).

On February 7, 2007, a broken tool on Operation 80 apparently caused 30 parts to be produced that were inferior but repairable.  (Motion for Summary Judgment, Exhibit 21). Richard Harris wrote up this incident and included in his write-up a reference to a January 22, 2007 incident where certain second shift workers said that Grant's shift had produced 43 bad parts.  *Id.*  For some reason that is not clear from the documents, the January 22 incident was not written up at the time it occurred but was included in the February write up on the request of Angela Harris of human resources.  *Id.*

Clay Shatteroe, a Chrysler employee and union steward, attests that the sensors and tooling on Operations 70 and 80 were bad, and that they were constantly running defective parts.  (Response, Exhibit 5, Clay Shatteroe Aff.)  Shatteroe also stated that Grant was the only woman working on Operation 70 and Operation 80.  *Id.*

Grant charge of discrimination

On February 8, 2006, while serving her 30 day disciplinary layoff, Grant brought charges of harassment and discrimination against Steele.  In her charge, Grant claimed that Steele subjected her to different standards than other employees.  (Motion for Summary Judgment, Exhibit 22).  Grant alleged that she requested gloves to change tools on Operation 80 but no gloves came and she was required to get them herself.  When she returned to her job, Crawford told her that he was going to write her up on Steele's request for starting her machine late.  *Id.*  Grant alleged that George Regerus at Operation 90 often started his machine late without incident.  *Id.*  Grant also complained that malfunctions at Operation 80 caused defective parts to be run, causing excessive scrap, and that Steele refused to do anything about it.  *Id.*  Grant claimed that the second shift operator didn't

check the rejected parts as required and was not disciplined for that.  *Id.*  Grant also claimed that Operation 80 had problems with a reamer tool and that Steele required her to tighten the tool with a torque wrench, while other operators were permitted to use an allen wrench.  Grant also claimed that Operation 70 had a system problem.  She claimed that she was told that Steele turned down her IPQ on this issue and also turned down her request for a light on the gauge table, which she requested so that she could see the cranks better.

Grant also alleged that other employees also ran scrap off the same machine as she did and received less discipline or none.  Finally, Grant stated that other employees told her that Steele was "out to get" her and that Steele told other employees not to let her "f*** you around."  (Motion for Summary Judgment, Exhibit 22).

Chrysler has submitted the results of an internal investigation in to Grant's charge. (Motion for Summary Judgment, Exhibit 24).  The investigation concluded that Grant had been appropriately disciplined for producing excess scrap.  It also concluded that other employees who had produced excessive scrap had received discipline except for Reed, who received a "conversation planner" instead of discipline.  The report also concluded that the operations run by Grant were difficult to run.

On the subject of the "conversation planner" issued to Reed in lieu of discipline, Chrysler submits a declaration by Bridget Crane, human resources manager, in which Crane avers that the conversation planner concept was introduced by management in late 2005 and was used in conjunction with Reed in November 2005 when he first produced excessive scrap.   (Motion for Summary Judgment, Exhibit 26, Crane declaration). According to Crane, it was not intended to be used in the case of an employee that had

already been disciplined.   Because Grant had already been disciplined in April 2005, she was not eligible for the conversation planner in late 2005.  *Id.*

### Facts relating to Oginski termination

Christopher Oginski began working for Chrysler in January 2000 as a production and maintenance supervisor.  (Motion for Summary Judgment, Exhibit 2, Oginski dep. 16, 44). Oginski was a direct supervisor of Grant at the Mack Avenue facility during the latter part of 2005 and reported to Thomas Steele.

Some time in October or November 2005, Oginski contacted human resources at the Mack Avenue facility to report his belief that Steele was discriminating against Grant. He spoke to Debra Felek in human resources and gave her a written statement.  Oginski dep. 26-27.[1]  Oginski also reportedly spoke to Steele on a number of occasions about his treatment of Grant.  Oginski specifically complained that Steele required Grant to do a number of things that were not required of male operatiors, such as pulling heavy parts out of stalled machines.  Oginski dep. 32.

Oginski also testified that Steele would on occasion refer to Grant as an "old bitch" and a "lazy black bitch."  Oginski dep. 40.  Steele also allegedly told Oginski that he (Steele) did not want Grant in his department, and that it was up to Oginski to write up Grant and have her removed from the department.  Oginski dep. 43.

Concerning Oginski's write up of Grant in October 2005, where Grant's operation produced 83 pieces of scrap, Oginski took issue with the statement in the report, attributed to him, that if the 50 check part requirement had been complied with then no more than 50 pieces of scrap would have been produced.  Oginski dep. 89-90.  Oginski testified that the

---

[1] Felek denies having spoken to Oginski about Grant or received a written statement on the subject.  This is a factual issue and the Court on summary judgment must accept Oginski's version as true.

machines continued to manufacture parts while the check part process was going on because of Steele's instructions, and that therefore an unknown number of parts could be produced following the 50th piece. *Id.* Oginski also testified that he raised a concern with Steele that the way his report had been edited made it inaccurate. Oginski dep. 93.

Oginski testified that other employees under his supervision also produced scrap, but he could not recall names or specific incidents. Oginski said that there was more than one occasion that Operation 80 produced hundreds of pieces of scrap, but that occurred on the weekend or second shift, and Oginski was not directly involved and did not know if discipline was issued as a result. Oginski dep. 94-95.

<u>Events of November 1, 2005 and Oginski's subsequent termination</u>

On November 1, 2005, Oginski was production supervisor at the Mack Avenue facility. Darrell Osborne, an hourly employee on the line, was scheduled to arrive for work at 5:30 a.m. Oginski dep. 97-98. Osborne had attendance problems at the time and was due for a disciplinary lay off if he was tardy. Oginski dep. 98; Osborne declaration at ¶ 3. Osborne called Oginski on his cell phone and told Oginski that he (Osborne) had forgotten his time card and was unable to get in and would be late if he returned home to get it. Oginski dep. 100-101. Oginski told Steele that Osborne wasn't coming in because he didn't have a badge and couldn't get in the plant. Oginski dep. 102. Steele came to Oginski's work station and demanded to know where Osborne was. Oginski dep. 105. Steele also told Oginski to move another employee onto the operation. Oginski told Steele that he had Osborne on the phone, and asked what Steele wanted him to do. Steele said "get him in here, any way you can, and get him on the job." Oginski dep. 106.[2]

_____

[2]Chrysler presents a different version of these events. Chrysler has offered evidence that Osborne had his card with him and used his card to get into the parking facility at 5:29. Chrysler has also submitted testimony by Osborne that he told Oginski that he (Osborne)

Oginski met Osborne at the turnstile, handed Osborne his card, and allowed Osborne to enter the facility. Oginski dep. 107-08. Oginski subsequently went into the time system and entered Osborne as having arrived that day at 5:30 a.m., and noted in the system that "employee forgot card and could nopt (sic) get into the gate. Call box was not answering. Employee was on time but could not get into plant." Motion for Summary Judgment, Ex. 36.

Steele testified that he saw on his computer that Osborne had not punched in at 5:33. Steele said that he then saw Osborne and Oginski together in the plant walking toward Osborne's machine and became suspicious. Steele contacted his supervisor and asked that the incident be investigated. (Motion for Summary Judgment, Exhibit 23, Steele dep. 164-65). He also forwarded a copy of Osborne's timesheet, with Oginski's notation on it, to Bridget Crane in human resources in an email with the subject line " Fw: Foul Play CATs Punch/Call in." (Motion for Summary Judgment, Exhibit 36). Steele also wrote a statement of facts about the incident. Steele dep. 176. Oginski was suspended on November 10, 2005, and terminated effective November 21, 2005. (Motion for Summary Judgment, Exhibit 38). The reasons given for his termination were providing false or misleading information to the corporation, theft, fraud or misappropriation, and permitting improper use of his badge. *Id.*

Oginski filed a charge of discrimination with the Michigan Department of Civil Rights on January 5, 2006. (Motion for Summary Judgment, Exhibit 42). In his charge, Oginski alleges that he was terminated in retaliation for opposing Steele's allegedly discriminatory treatment toward Grant. *Id.* He alleged specifically that he was retaliated against for

---

was going to call in absent, rather than come in late and get a disciplinary lay-off. This is a factual issue that is inappropriate for the Court to resolve on summary judgment.

opposing the discipline meted out to Grant for producing 85 pieces of scrap one week before the November 1 incident, and that he was suspended "under the false pretense of following the common practices of the company by letting a subordinate in the facility for not having a time badge." *Id.*

Chrysler has introduced evidence that at least one other supervisor was disciplined for allowing Osborne to use his badge. Tyrone Miles testified that he had a statement of facts put in his file in 2003 for letting Osborne use his badge to exit the facility so that Osborne would not have his time docked. (Motion for Summary Judgment, Exhibit 43, Miles dep. 24-26). Miles did not receive any further discipline as a result of this incident. Miles dep. 28. Miles was not aware of any other incident involving a supervisor receiving discipline, and testified that he was "shocked" at receiving the statement of facts. Miles dep. 29.

Mark Grimaldi, another supervisor at the Mack Avenue facility, testified that he had used his badge to admit an employee, Jacklyn Jacks, that was having trouble getting in with her badge. (Motion for Summary Judgment, Exhibit 45, Grimaldi dep. 16-17). Grimaldi documented his action in the CATS system and told his manager about it in the morning. Grimaldi dep. 18. Grimaldi was not disciplined for the incident. *Id.* Grimaldi testified that in his 12 years as a supervisor he was aware of 3 supervisors that had been terminated at Chrysler, aside from Oginski: William Jeter, Bill Doan and Ricardo Boozer. Grimaldi dep. 20-21.

Chrysler has submitted the declarations of plant manager Richard Collins and of human resources employees Bridget Crane and Fred Castlevetere. (Motion for Summary Judgment, Exhibits 26, 39, 40). Crane's declaration states that only she, Collins and Castlevetere were involved in the decision to terminate Oginski, and that Steele was not

consulted about whether Oginski should be terminated.  Crane decl. ¶ 7-8.  Collins and Castlevetere state that they concurred in the decision.  Collins decl. ¶ 4, Castlevetere decl. ¶ 3.  All three state that they were unaware of Oginski's allegations against Steele at the time the decision was made to terminate Oginski.  Crane decl. ¶ 8; Collins decl. ¶ 5; Castlevetere decl. ¶ 4.

It is undisputed that Chrysler's policy provides that permitting another to use one's time badge is a violation of Chrysler's standards of conduct.  Oginski testified, however, that it was his understanding that such use was only a violation for hourly employees, not for supervisors.  Oginski dep. 19-20.

Plaintiffs have also submitted a letter by Sam Serra, who was a maintenance supervisor at the Mack Avenue facility from July 2000 to September 2003.  In his letter, Serra states that it was commonplace for employees to forget their time card and not be able to punch in and would need security to allow them to enter.  His letter also states that it was normal practice for a supervisor to adjust the employee's time and record a note in the CATS system and that he never witnessed or heard of an anyone disciplined for violating this rule.  (Response Exhibit 25).

Plaintiffs have submitted an affidavit by Osborne in support of plaintiff.  (Response Exhibit 26, Osborne Aff.)  In his affidavit, Osborne states that he was terminated at the same time Oginski was terminated and for the same reason, but was returned to his job through the union grievance procedure.  After Osborne returned to work, he spoke to Steele, who stated to Osborne that he was "with the wrong person at the wrong time." Osborne Aff. ¶ 14.  He also states that Steele "had it out for Christopher Oginski."  Osborne Aff. ¶ 15.

II.      MOTION TO STRIKE

Chrysler has filed a motion to strike certain parts of the EEOC's response to Chrysler's motion for summary judgment and a declaration filed in support of EEOC's response.

In support of its summary judgment motion, Chrysler has submitted a right to sue letter from the EEOC to Grant, in which the EEOC stated that the evidence did not support Grant's claim of discrimination.  The EEOC apparently subsequently reversed itself and reopened Grant's case, and it argues in its response brief that the reason it reversed itself was evidence uncovered in investigating Oginski's charge.  Chrysler has moved to strike the EEOC's argument as to why it reopened Grant's charge of discrimination on the grounds that the EEOC refused to answer interrogatories or allow its witnesses to testify about the decision on the grounds of attorney client privilege.  The EEOC has argued that the charge is inadmissible.

At first blush, Chrysler's argument makes sense; the EEOC should not be able to cite its purported reasons for reversing itself after denying Chrysler the opportunity to investigate the grounds for the decision in discovery.  Privileged communications cannot be used both as a sword and a shield in this manner.  *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005).  But the EEOC's argument is made in response to Chrysler's introduction into evidence of the EEOC right to sue letter, in which the EEOC found that the evidence did not support Grant's charge.  It appears to the Court that the EEOC's intent is not an element of either the EEOC's claim or Chrysler's defense.  Absent some argument that the right to sue letter in some way estops the EEOC from bringing the suit now, the right to sue letter appears to be irrelevant in the most basic sense - it fails to make any fact at issue either more or less probable.  Because the right to sue letter is not relevant to the present

12

motion, the Court will not consider either it, or the EEOC's argument in opposition, in deciding Chrysler's motion for summary judgment.  Therefore, Chrysler's argument on the first point of its motion to strike is moot.

Chrysler has also moved to strike the declaration of Tyran Mathies, submitted by the EEOC in support of its response, as well as the portions of the EEOC's response brief that relies on the Mathies declaration.  Mathies is a Chrysler employee, who states in her declaration, among other things, that Thomas Steele is "a snake."  Chrysler has moved to strike Mathies' declaration and the EEOC argument in reliance on that declaration, on several grounds.

First, Chrysler argues that the Mathies declaration is not an affidavit because it is not notarized, and does not satisfy the statutory requirements of a declaration made under the penalties for perjury because it does not cite the statute.  The Court does not find this first argument persuasive.  The declaration is signed, states that it is made on personal knowledge, and states that it is made subject to the penalties for perjury.  See 28 U.S.C. § 1746.  While the statute requires that such declarations be dated, the Sixth Circuit has interpreted the statute to require only substantial compliance, and has held that undated declarations may be admissible if a date can be established through extrinsic evidence. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475-76 (6th Cir. 2002).[3]  Therefore, the Court will not strike the Mathies declaration because it is undated.

Second, Chrysler argues that the EEOC did not disclose Mathies as a person with knowledge of the facts at issue in its initial Rule 26(a) disclosures or on its witness lists, that

---

[3]The Sixth Circuit has also held that it is not an abuse of discretion for the district court to strike an undated declaration for failing to comply with 28 U.S.C. § 1746.  *See Counts v. Kraton Polymers, U.S. LLC*, 260 F. App'x 825, 829 (6th Cir. 2008).  The matter appears to be completely within the Court's sound discretion.  The Court exercises its discretion here and declines to strike the Mathies declaration on this ground.

Chrysler was deprived of the opportunity to depose Mathies, and that it was thereby prejudiced. The EEOC responds by noting that Chrysler also relied on an affidavit by Fred Castlevetere, a person who was not identified on Chrysler's initial disclosures or witness lists. Chrysler replies that they did identify Castlevetere in a supplemental disclosure filed shortly before it filed its summary judgment motion, albeit after the close of discovery.

Chrysler's argument here also appears to be without merit. Mathies is a current employee of Chrysler. Chrysler did not supply the EEOC with the contact information for its employees until shortly before the summary judgment motion was filed, arguing that such information was confidential. The EEOC reasonably could not contact Chrysler employees until it had that information. Furthermore, Mathies is a current Chrysler employee, and presumably Chrysler is free to interview her at any time without relying on a subpoena. For these reasons, the Court denies Chrysler's motion to strike as it pertains to Mathies.

III.    MOTION FOR SUMMARY JUDGMENT

Chrysler has moved for summary judgment on the EEOC's complaint as to both Grant and Oginski, arguing that the EEOC has failed to produce evidence sufficient to establish a *prima facie* case as to either employee.

A.    Has the EEOC carried its burden of
      establishing a *prima facie* case as to Grant?

Chrysler argues that plaintiff has failed to establish a *prima facie* case of discrimination under 42 U.S.C. § 2000e-2(a) as to Grant because it has not produced either direct evidence of discrimination or circumstantial evidence sufficient to establish a *prima facie* case under the burden shifting approach articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

14

A plaintiff in a Title VII action for employment discrimination may establish discrimination either by introducing direct evidence of discrimination or by offering circumstantial evidence from which a jury could infer discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Direct evidence of discrimination is evidence which, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action." *Jacklyn v. Shering-Plough Health Care Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "'[D]irect evidence is found ... where an employer's policy is discriminatory on its face or where a statement by an employer directly shows there is a discriminatory motive.'" *Bush v. Dictaphone Corp.*, 161 F.3d 363, 370 (6th Cir. 1998) (*quoting Schlett v. Avco Fin. Serv., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996)). Furthermore, statements that are "'unrelated to the decisional process' at issue, do not constitute 'direct evidence.'" *Bolander v. BP Oil Co.*, 128 F. App'x 412, 416 (6th Cir. 2005) (*quoting Bush*, 161 F.3d at 369).

Applying this standard, the Court finds that plaintiff has not come forward with direct evidence that Steele disciplined Grant based upon her gender. While plaintiff points to Steele's alleged epithets of "bitch" and "black bitch" as direct evidence of discrimination, there is nothing in the record that connects such statements to the adverse employment decisions alleged. Absent such connection, the statements do not constitute direct evidence of discrimination.

In the absence of direct evidence of discrimination, a plaintiff may establish a *prima facie* case of discrimination under Title VII by showing that (1) the plaintiff is a member of a protected class, (2) she was qualified for her job, (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *White v. Baxter*

15

*Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). If the plaintiff establishes her *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered explanation is a pretext for discrimination. *Id.*

Chrysler argues that plaintiff cannot establish the second or fourth elements of a *prima facie* case as to Grant. Chrysler argues that plaintiff cannot establish that Grant was qualified because of her record of producing excessive scrap, and plaintiff cannot establish that Grant was treated differently than other similarly situated male employees.

1.    Is this a mixed motive case (EEOC argument)

In its reply, the EEOC does not argue that it can establish Grant's *prima facie* case under the *McDonnell-Douglas* framework. Instead, the EEOC argues that it can establish a *prima facie* case under a "mixed-motive" framework.

Section 2000e-2(m)[4] permits a plaintiff to show that an employer has engaged in a unlawful employment practice where the plaintiff can show that the employment practice was motivated, at least in part, by an illegitimate consideration. The Sixth Circuit has recently held that the *McDonnell-Douglas* framework is inappropriate in mixed motive cases. Instead, the court has held that in a mixed motive case a plaintiff may establish a *prima facie* case by producing sufficient evidence from which a jury can conclude that (1) the defendant took an adverse employment action against the plaintiff, and (2) race, color,

---

[4]    Impermissible consideration of race, color, religion, sex, or national origin in employment practices: Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.
42 U.S.C. § 2000e-2(m)

religion, sex or national origin was a motivating factor for the adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d at 400.

### 2. May the EEOC argue a mixed motive claim?

As an initial matter, the Court must address Chrysler's argument that the EEOC may not assert a mixed motive claim because the EEOC's complaint only references the general anti-discrimination provision of 42 U.S.C. § 2000e-2(a)(1), and does not specifically reference 42 U.S.C. § 2000e-2(m). Chrysler argues that because the complaint does not reference subsection 2(m) or state that Grant's gender was a "motivating factor" in her termination, the EEOC cannot rely on subsection 2(m) and the Court must treat this as a single-motive case. Chrysler cites a footnote in *White*, in which the court states that because the plaintiff there had "presented his failure to promote claim as a single-motive discrimination claim brought pursuant only to 42 U.S.C. § 2000e-2(a)(1) ... we do not analysis his claim under the unique mixed-motive summary judgment analysis that is appropriate for claims brought pursuant to 42 U.S.C. § 2000e-2(m)." *White v. Baxter Healthcare Corp.*, 533 F.3d at n.4 (quoted in Defendant's Reply at 2).

The Court is not persuaded by this argument. Subsection 2(m) appears by its terms to define or modify the quantum of evidence needed to establish an "unlawful employment practice" in cases where an employer asserts non-discriminatory reasons for an employment action. Subsection 2(m) does not create a cause of action for employment discrimination. Rather, it appears that any action brought by an employee for discrimination on the basis of protected classifications is brought pursuant to the "general antidiscrimination provisions" of Subsection 2(a). The statement in the *White* footnote appears simply to assert that White, in his failure to promote claim, was not asserting a mixed motive claim in response to the defendant's summary judgment motion or on appeal,

17

so the court did not analyze the claim using a mixed motive analysis.  The footnote  does not reference White's complaint or require an explicit reliance on Subsection 2(m) in the complaint.  Here, on the other hand, the complaint specifically references the Civil Rights Act of 1991, which, among other things,  added Subsection 2(m) to Title VII.   Thus, the Court finds that Grant may proceed on her claim pursuant to the mixed-motive analysis set forth by the Sixth Circuit in *White*.[5]

### 3.   Elements of a Mixed Motive Claim

To establish her *prima facie* case of discrimination alleging a mixed motive claim, the EEOC must produce sufficient evidence upon which a jury may conclude that Grant suffered an adverse employment action and that her gender was a motivating factor for the adverse employment action.  *White*, 533 F.3d at 400.  It is undisputed that Grant's disciplinary layoffs constituted adverse employment actions.  Therefore, the only issue is whether Grant has produced sufficient evidence upon which a jury could conclude that her gender was a motivating factor in the disciplinary lay-offs.

To say that gender played a motivating part in an employment decision means that "if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (superseded by statute on other grounds).  In order for the plaintiff to establish that an employer actually relied upon her gender, stereotyped remarks can be evidence that gender played a part in the employment decision.  *Id.* at 251.

---

[5] At the hearing on this matter, Chrysler relied upon *Ridgley v. U.S. Dept. of Labor*, 298 F. App'x 447 (6th Cir. 2008) in further support of its argument that a mixed motive analysis cannot be used in this matter.  *Ridgley*, however, merely stands for the proposition that a mixed motive analysis is not appropriate in the face of a factual finding that retaliation was not even a partial motivating factor, and therefore the case is not relevant.

The EEOC argues that the following evidence is sufficient for a jury to find that Grant's gender was a motivating factor in her disciplinary lay-offs: Grant's supervisor, Oginski, testified that Steele repeatedly made statements to Oginski indicating that Steele did not like Grant. Shatteroe, Grant's union representative, testified to the following: (1) Grant was the only woman working Operations 70 and 80, (2) that although the excessive scrap was not Grant's fault, Steele wanted to make sure Grant was written up, (3) that Shatteroe raised the idea of using the conversation planner with Steele, but Steele said he did not want to discuss it, and (4) that he (Shatteroe) believed that Steele did not like women working for him and did not want Grant in his department. Tyran Mathies, a female co-worker of Grant's, also testified that Steele tried to have Grant written up all the time, and did not make sure that male workers were written up all the time, and referred to a woman tool maker as "half" a tool maker.

Chrysler's argument in opposition is essentially that Steele had no role in the decision to discipline Grant on April 7, 2005 (written warning) or January 12, 2006 (30 day suspension); that Steele did not have the authority to discipline Grant because discipline always came from human resources; that there is no evidence that Steele tolerated excessive scrap from male employees; and that Chrysler disciplined more than thirty men during the relevant time period for which it disciplined Grant.

The first two arguments are not persuasive. The record reflects that while all discipline was issued by human resources, that department only acted in Grant's case once the disciplinary process was started by management on the floor of the plant. As to the arguments that the evidence does not reflect any role by Steele in the April warning or the January suspension, there is sufficient evidence in the record from which a jury could infer

that Steele, as the direct supervisor of the supervisors that instigated those disciplines, could have influenced the discipline.

As for Chrysler's third argument, that there is no evidence that Steele tolerated excessive scrap from male employees, this argument is more persuasive, but ultimately not dispositive. While plaintiff's case would be a stronger one with such evidence, the Court finds that plaintiff has adduced sufficient evidence to avoid summary judgment, considering the facts in the record in the light most favorable to the plaintiff.

The quantum of evidence required for a mixed motive plaintiff to prevail is set forth in 42 U.S.C. § 2000e-2(m), which provides:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C.A. § 2000e-2(m).   That an impermissible motive was a motivating factor for an employment practice can be proved by either direct or circumstantial evidence.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003).  All that is required for a plaintiff to go to the jury on a section 2000e-2(m) claim is "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Desert Palace*, 539 U.S. at 101 (*quoting* 42 U.S.C. § 2000e-2(m)).   "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 400 (6th Cir. 2008)

Reviewing the evidence in the record in the light most favorable to the plaintiff, the Court concludes that plaintiff has come forward with sufficient evidence from which a jury

could infer that defendant discriminated against Grant, and that such discrimination was a motivating factor in her disciplines. On one hand, the evidence before the Court suggests that the machines that Grant operated produced excessive scrap that Grant did not detect in the regular parts checking procedure and that Grant was disciplined as a result pursuant to established policy. There is no evidence that Grant was disciplined more than the policy allowed, and there is no evidence that Steele failed to discipline any male worker that produced excessive scrap. There is also evidence from which a jury could conclude that Steele held a bias against women working in his department, and had at least one of Grant's supervisor's file a statement of facts that he felt was unwarranted. While there were objective factors that prompted each statement of facts and each discipline, the plaintiff has come forward with evidence from which a jury could infer that Grant was subject to scrutiny that would not have been present if she had been a man. The Oginski deposition provides evidence that Steele required him to write up a report on Grant's production of scrap that Oginski felt was not accurate or fair, and that Steele called Grant a "lazy black bitch." Finally, while there are objective standards in Chrysler's standards of conduct, and the violation of such standards would permit the discipline given to Grant, it also appears that there was a certain amount of discretion given to management in determining the discipline given for violating Chrysler's standards of conduct. Given this evidence, a jury could infer that Steele had an animus that resulted in Grant's work being given extra scrutiny on the basis of her gender, and that the subsequent discipline she received was motivated, at least in part, by her gender. This is not to say that plaintiff's case as to Grant is a strong one. Indeed, the Court finds it just barely passes muster, and only because the Court is required to view all facts and draw all inferences in favor of the nonmoving party when considering a motion for summary judgment. Applying this

21

standard, the Court finds that plaintiff has adduced sufficient evidence to avoid summary judgment, and therefore Chrysler's motion for summary judgment as to charging party Grant will be denied.

> B.    Has the EEOC carried its burden of establishing a *prima facie* case as to Oginski?

Chrysler has also moved for summary judgment on the EEOC's claims on behalf of Christopher Oginski. The EEOC claims that Chrysler fired Oginski in retaliation for opposing Steele's discriminatory treatment of Grant. A *prima facie* case of retaliation can be established by proof that (1) an employee engaged in activity protected by Title VII; (2) the activity was known to the employer; (3) the employer thereafter took an adverse employment action against the employee; and (4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision. *Id.* at 792-93. The plaintiff bears the burden of persuasion throughout, and, to prevail, must demonstrate that the employer's proffered reason was not the true reason for the employment decision. *Id.* at 793.

Title VII prohibits retaliation by an employer when an employee either opposes any practice made unlawful by the statute or participates in any manner in any investigation, proceeding or hearing under the statute. 42 U.S.C. § 2000e-3(a). This circuit draws a distinction in retaliation claims between cases brought under the opposition clause and those brought under the participation clause. While exceptionally broad protections are afforded employees who have participated in Title VII proceedings, lesser protection is given to employees who oppose Title VII violations. The Sixth Circuit has held that in cases involving opposition to discrimination, the courts must balance the purpose of the act in

protecting persons engaging in activities opposing discrimination with Congress' manifest desire not to tie the hands of employers. *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (considering analogous provisions of Elliott-Larsen Act). Chrysler argues that Oginski's activities fall under the opposition clause of subsection 3(a) and are therefore entitled to a lesser degree of protection.[6]

The Court agrees with Chrysler that Oginski's claim should be analyzed under the opposition clause rather than under the participation clause, because Oginski was terminated in November 2005, more than two months before Grant filed her formal charge in February 2006. The Sixth Circuit has held that activity by an employee prior to the initiation of statutory proceedings is to be considered pursuant to the opposition clause. *Booker*, 879 F.2d at 1313.

Chrysler argues that under the lesser protection provided by the opposition clause, the plaintiff cannot show that Oginski reasonably believed that Steele's conduct violated Title VII. Chrysler maintains that Steele's demand that Grant engage in physical activities that male coworkers were not required to perform was pursuant to an "internal policy" that applied to all operators, both male and female. Therefore, Chrysler argues, Oginski's complaints amount to nothing more than a "vague charge of discrimination" that is insufficient to constitute opposition to unlawful employment practices.

Chrysler's argument on this point is not supported by the evidence. Oginski testified that he told Steele that male employees were not actually being required to crawl into the

---

[6] Chrysler overstates the difference between the two standards. The Sixth Circuit has held that "the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable." *Johnson v. University of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000). The opposition clause only requires a "reasonable and good faith belief that the opposed practices were unlawful.'" *Id.* (citing EEOC Compliance Manual (CCH) para. 8006)

machine and remove the parts from the machine, and that Steele's requirement that Grant do so could run afoul of the law.  A jury could infer from this testimony that Chrysler's facially neutral policy was applied inconsistently to Grant, the only woman performing that particular job.  There is also evidence in the record that would support a finding that Oginski raised concerns with Steele that the write-up of the October 26, 2005 incident of excessive scrap was inaccurate and unfair to Grant.  Taken together, the Court finds that the plaintiff has produced evidence of opposition sufficient to avoid summary judgment on this issue.

Chrysler also argues that the plaintiff has not produced evidence on the last prong of its *prima facie* case as to Oginski's discharge because it has not shown that his discharge was causally connected to his complaints.  This contention is not persuasive. Steele reported Oginski for violating the time card policy, circulated Osborne's time sheet only a week after Oginski allegedly clashed with Steele over the Grant report, and paid a personal visit to human resources.  A jury could consider this to be circumstantial evidence that Oginski's opposition to Steele's treatment of Grant was a factor in Steele's actions. *See DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004) (twenty-one day span between protected activity and termination sufficient to create inference of retaliatory motive in ADEA claim); *Johnson*, 215 F.3d at 582 ("[a] causal link may be shown through knowledge combined with closeness in time that creates an inference of causation").   Further, there is evidence in the record from which a jury could conclude that Oginski informed Steele, human resources, and the union of his complaints regarding Steele's conduct shortly before his termination.  For these reasons, the Court finds that the EEOC has presented evidence sufficient to establish a *prima facie* case of retaliation as to Oginski.  *Compare Booker*, 879 F.2d at 1313 (holding that employee's unsupported allegation in a letter that his

24

supervisor's complaints are the result of "ethnocism" is too vague to constitute opposition for purposes of Elliott-Larsen claim).

    C.    <u>Has the EEOC Offered Sufficient Evidence of Pretext</u>

Chrysler argues finally that even if the EEOC can establish a *prima facie* case of retaliation, summary judgment is appropriate because Chrysler can establish a legitimate, non-discriminatory reason for Oginski's termination, the violation of the timecard policy. Chrysler argues that it made a "reasonably informed and considered decision" to terminate Oginski, which included interviewing Oginski and Osborne, and reviewing the videotape and company records showing the use of badges on the morning of November 1, and has offered evidence that other employees were terminated for improper badge use as well. Under these circumstances, Chrysler argues, no reasonable juror could conclude that Chrysler's proffered reasons for Oginski's termination were pretextual. See Motion for Summary Judgment at 19 (*citing Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005)).

The Court disagrees. Pretext may be established for purposes of Title VII "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). There is no evidence in the record that termination was mandatory following violation of the time badge policy. On the other hand, there is evidence in the record that other Chrysler supervisors used their badges to let hourly employees pass without being disciplined, and that when discipline was imposed for that conduct, it was far less than termination. Furthermore, there is Oginski's testimony that he was acting on Steele's instruction and with his knowledge in using his time badge to admit Osborne. Given this evidence, a reasonable juror could conclude that Chrysler's proffered reason for Oginski's termination, his violation of the time

25

badge policy, was pretextual in that it was insufficient to merit termination and that the real reason for his termination was his complaints about Steele's treatment of Grant and his stated concern that Steele treated Grant differently because of her gender.  The fact that Steele was not the decision maker in Oginski's termination is not dispositive; human resources acted on Steele's instigation and in consultation with him in making the decision.

These facts distinguish the *Balmer* case, relied upon by Chrysler.  In *Balmer*, the court found that the plaintiff there had not presented any material evidence upon which a reasonable jury could conclude that the company had not made a "reasonably informed and considered decision" and honestly believed that Balmer had misused company funds when it decided to terminate the plaintiff.   *Balmer*, 423 F.3d at 615.  Here, evidence has been presented upon which a jury could conclude that Chrysler had not made a "reasonably informed and considered decision" for terminating Oginski for a single instance of misconduct that had not resulted in termination for any other Chrysler supervisor.  Thus, a reasonable jury could conclude that Chrysler's proffered reason for terminating Oginski was pretextual.

Finally, the Court notes that the Sixth Circuit recently affirmed a grant of summary judgment in a Title VII case that had some strong factual similarities to this case, *Sybrandt v. Home Depot, U.S.A., Inc.*,  No. 08-5598 (6th Cir. March 26, 2009), which it would be helpful to address here.  In *Sybrandt*, the Sixth Circuit affirmed summary judgment for the defendant Home Depot , U.S.A., Inc.  where Home Depot had terminated the plaintiff for allegedly breaching its "no-self-service policy" by allowing a co-worker to process a special-service order for the plaintiff and by the plaintiff's subsequently entering electronic "notes" on the computerized history of the same transaction.  *Sybrandt*, slip op. at 3.   The Sixth Circuit held that the plaintiff had failed to establish a genuine issue of material fact

regarding pretext because she had failed to produce evidence that Home Depot did not have an honest belief that Sybrandt had violated the company policy.  Slip op. at 11.  In coming to this conclusion, the Court of Appeals relied upon defendant's evidence that it had conducted an investigation of the charges against Sybrandt.  Slip op. at 7-8.

The Court has considered the *Sybrandt* decision and concludes that, despite these factual similarities, it is distinguishable from the present case and therefore does not alter the above analysis.   In *Sybrandt*, the evidence showed that the person who had recommended terminating Sybrandt, Ed Malowney, had, in the three years preceding his deposition, recommended discharging 18 Home Depot employees for the same reason he had recommended terminating Sybrandt, violation of the "no-self-service" policy.  Slip op. at 4.  Furthermore, the Home Depot Code of Conduct stated that violation of the "no-self-service" policy was considered to be a "Major Work Rule Violation[]" that "will normally result in termination for a first offense...."  Slip op. at 2.  There are no such unequivocal facts supporting the employer's decision in this case.  Finally, the Court of Appeals in *Sybrandt* noted that the plaintiff had adduced no evidence of discrimination aside from the evidence that established her *prima facie* case, and stated that "[t]he bare fact that Sybrandt was replaced by a male employee, in the absence of any other evidence that would support a charge of sex-based discrimination, is simply not enough to survive summary judgment."  Slip op. at 11-12.  Here, as discussed above, the plaintiff has produced sufficient evidence beyond its *prima facie* case from which a jury could conclude that Chrysler's proffered explanation was pretextual.

IV. CONCLUSION

For the reasons stated above, Chrysler's motion to strike is **DENIED** and Chrysler's motion for summary judgment is also **DENIED**.

27

**SO ORDERED**

.

                                      s/Stephen J. Murphy, III
                                      STEPHEN J. MURPHY, III
                                      United States District Judge

Dated: March 27, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 27, 2009, by electronic and/or ordinary mail.

                                        Alissa Greer
                                        Case Manager